## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| LARRY REED and DARNELL MCCOY, SR., *on behalf of themselves and all individuals similarly situated*, | Case No.: |
| Plaintiffs, | |
| v. | |
| GENERAL MOTORS LLC and ONSTAR, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Larry Reed and Darnell McCoy, Sr., on behalf of themselves and all others similarly situated, brings this action against General Motors LLC ("GM"), and OnStar, LLC ("OnStar") (collectively "Defendants"). The following allegations are based on Plaintiffs' knowledge, investigations of counsel, facts of public record, and information and belief.

## SUMMARY OF THE CASE

1.    This case arises out of GM and its subsidiary software company OnStar's surreptitious collection of customers', including Plaintiffs', driving telematics data (including acceleration events, hard brake events, high speed events, distance, and VIN) and their sharing and/or sale of that data to third parties to compile reports used by auto insurance companies to set rates and premiums, all

without the customers' knowledge or consent.

2.    OnStar ostensibly provides WiFi and location information for emergency services in case of an accident, but customers were not aware OnStar was tracking data points about their driving and then providing reports (stripped of all context) to their auto insurers to justify a raise in their rates.

3.    Usage-based insurance plans, in which an auto insurance company directly obtains telematics data through an onboard device or a mobile application, are increasingly common. However, here, GM and OnStar customers like Plaintiffs and Class Members did not have such an insurance plan, but their private telematics data was still collected and provided to insurance companies.

4.    The GM and OnStar agreements fail to adequately disclose that the companies collect and share and/or sell customers' driving data with third parties. At best, the disclosures that do exist are inadequate to inform customers of those practices or to obtain their consent.

5.    GM and OnStar deliberately buried the true function of the OnStar product, because such tracking and selling of data is enormously unpopular with GM customers and the general public.

6.    Then, on March 22, 2024, following a New York Times article about the practice published on March 11, 2024, GM announced that it had stopped the practice of sharing driving telematics data with third party data brokers LexisNexis

Risk Solutions and Verisk, a program that included more than 8 million vehicles. This suggests an acknowledgement by Defendants that they in fact did not have the requisite legal consent by their customers for this data sharing practice. However, Plaintiffs and the putative Class Members have damages from when Defendants carried out this practice.

7.     Plaintiffs and Class Members bring claims against Defendants for common law invasion of privacy, California constitutional invasion of privacy, and deceptive and unfair practices under the California Unfair Competition Law, Cal Bus. & Prof. Law §§ 17200 *et seq.* and the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.903 *et seq.*

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of different states than Defendants.

9.     The Court has personal jurisdiction over GM and OnStar as their headquarters and principal places of business are in Detroit, Michigan.

10.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because substantial part of the events giving rise to the

claims emanated from activities within this District, and Defendants conduct substantial business in this District.

## **PARTIES**

11.     Plaintiff Larry Reed is, and at all relevant times has been, a resident and citizen of Michigan, where he intends to remain.

12.     Plaintiff Darnell McCoy, Sr. is, and at all relevant times has been, a resident and citizen of California, where he intends to remain.

13.     Defendant GM is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. GM is an American multinational automotive manufacturing company that owns automobile brands including Chevrolet, GMC, Cadillac and Buick, and sells cars throughout the United States and internationally.

14.     Defendant OnStar is a limited liability company organized under the laws of Delaware, with its headquarters and principal place of business located in Detroit, Michigan. OnStar is a subsidiary of GM that provides subscription-based communications, in-vehicle security, emergency services, turn-by-turn navigation, remote diagnostics systems and information services throughout the United States and internationally.

## FACTUAL ALLEGATIONS

**A. GM has a history of colleting drivers' information.**

15.     GM was founded in 1908 and, as of 2023, was the largest automaker in the United States by sales.[1] Indeed, GM was the largest automaker in the *world* for more than 76 years.[2] GM's brands—Buick, Cadillac, Chevrolet and GMC—are household names. For the bulk of GM's existence as a juggernaut in the American marketplace, the corporation dealt in one major area: cars.

16.     In 1996, however, GM entered the information economy with the launch of OnStar, the name for an ever-growing suite of information services GM provides to drivers through the corporation's subsidiary of the same name.[3] In launching OnStar, GM was the first automaker to bring "connected car" features to market.[4] A "connected car" is one containing devices that *connect* to other devices within or outside of the car through internet networks and Bluetooth.[5] GM made

---

[1] Ex. 1, Mathilde Carlier, *Estimated U.S. market share held by selected automotive manufacturers in 2023*, STATISTA (Mar. 11, 2024), https://www.statista.com/statistics/249375/us-market-share-of-selected-automobile-manufacturers.

[2] Ex. 2, Nick Bunkley, *Toyota Ahead of G.M. in 2008 Sales*, THE NEW YORK TIMES (January 21, 2009), https://www.nytimes.com/2009/01/22/business/22auto.html.

[3] Ex. 3, *Definition of Connected Car – What is the connected car? Defined*, AUTO CONNECTED CAR NEWS (Apr. 22, 2014), archived at https://web.archive.org/web/20230903042010/https://www.autoconnectedcar.com/definition-of-connected-car-what-is-the-connected-car-defined/.

[4] *Id.*

[5] *Id.*

OnStar, in collaboration with Motorola Automotive, at a time when cellular voice connections were not reliable.[6] OnStar was advertised as a safety product that utilized a "telematics system" (long-distance transmission of computerized information) to connect drivers making voice calls to a call center that contacted emergency responders in the case of accidents when an airbag was deployed.[7]

17.    Over time, GM's developed OnStar to include a growing range of features that collected information from driver's and their GM-brand cars. OnStar's original safety features were soon appended with GPS location services and the ability to transmit voice and other data at the same time.[8] In 2001, remote diagnostic capabilities were introduced, which allowed for drivers' car issues to be diagnosed by experts from a distance.[9] GM added vehicle health reports, turn-by-turn directions, and a network access device in 2003.[10] By 2014, GM had deployed 4G LTE *en masse*, connecting drivers to high-speed internet virtually anywhere.[11] One year later—in 2015—OnStar had processed 1 billion requests from customers.[12] In 2020, General Motors reached 1 million OnStar WiFi subscriptions.[13]

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] Ex. 4, Sam Mceachern, *General Motors Reaches 1 Million OnStar Wi-Fi*

18.     In addition, GM has provided information services and collected driver data through drivers' *cell phones*, separate from the car product. In 2010, GM launched OnStar-capable mobile apps specific to each of its four brands—the myBuick, myCadillac, myChevrolet, myGMC Mobile Apps.[14] In 2021, GM made the OnStar Guardian App available to any driver in the United States.[15] The Guardian app uses sensors in the phone, such as the accelerometer and the GPS receiver, to provide some traditional OnStar services (e.g., automatic crash notification), regardless of the vehicle in which the user is riding.[16]

19.     Of course, the connected car is a two-way street. What GM customers gain in connectivity, GM gains in highly personal data.

**B.  GM is profit-motivated to collect driver data by enrolling customers in its information services, including OnStar.**

20.     Because GM can benefit from sharing driver data with third-party data brokers, GM is motivated to enroll drivers in its information services even when

---

[14] *Subscriptions Milestone*, GM Authority (Oct. 20, 2020), https://gmauthority.com/blog/2020/10/general-motors-reaches-1-million-onstar-wi-fi-subscriptions-milestone/#google_vignette.

[14] Ex. 5, Jake Holmes, *GM to Launch Brand-Specific OnStar Mobile Apps for Android and iPhone*, Car and Driver (Jul. 23, 2010), https://www.caranddriver.com/news/a18736585/ gm-to-launch-brand-specific-onstar-mobile-apps-for-android-and-iphone/.

[15] Ex. 6, LaReau, Jamie L., *GM offers OnStar service to drivers of any vehicle in US, Canada*, Detroit Free Press (June 7, 2021), https://www.freep.com/story/money/cars/general-motors/2021/06/07/onstar-guardian-app-gm-cars/7546541002/.

[16] *Id.*

customers have not consented. According to a 2015 industry analysis of the connected car market, one of the "barriers" to the market success of the connected car in the past few years is the fact that "customers are reluctant to pay the extra costs associated with embedded connectivity and instead use their smartphones as a solution for their in-car connectivity needs."[17] The authors of the analysis note that this reluctance by customers to pay for connected information services is likely to continue in the short term and noted that car manufacturer are "turning to smartphone integration in an effort to satisfy customer demand for connectivity . . ."[18] By bombarding drivers with information services in their cars *and* on their phones, GM and OnStar have made it likely that drivers will unknowingly enroll in a data collecting, information service. As a result, GM and OnStar have effectively done away with customer choice entirely.

21.    For example, in 2022, GM forced customers to pay for a three-year "OnStar and Connected Services Premium Plan" by including the cost of the service in the manufacturer's suggested retail price on some of its vehicles, even if customers did not want to use the subscription service.[19] A GM spokesperson

---

[17]    Ex. 7, *Connected Car Report*, EVERIS, archived at https://web.archive.org/web/201505180756 03/http://www.everis.com/global/WCRepositoryFiles/everis%20connected%20car %20report.pdf
[18] *Id.*
[19] Ex. 8, Kalea Hall, *GM makes OnStar, connected services plan standard on some*

acknowledged the default option, stating that "[b]y including this plan as standard equipment on the vehicle, it helps to provide a more seamless onboarding experience and more customer value."[20]

**C. Insurance companies make use of the driver data generated and collected by GM through OnStar.**

22.    The data provided by greater vehicle connectivity is impacting the car insurance industry.[21] Predictive-modeling and machine-learning technologies, as well as real-time data streaming, providing information on driving speed, routes and time, are changing how insurers' do business.[22] Early adopters have begun to adjust their offering to the developments in the automotive industry, leading them to transition from being pure insurance product providers to becoming insurance-service hybrids, that depend on driver data collected from customers.[23]

23.    For example, one large insurance company introduced its usage-based-

---

*vehicles*, THE DETROIT NEWS (Aug. 9, 2022), https://www.detroitnews.com/story/business/autos/ general-motors/2022/08/09/gm-makes-onstar-connected-services-plan-standard-some-vehicles/10278523002/.
[20] *Id.*
[21] Ex. 9, *Connected car, automotive value chain unbound*, MCKINSEY & CO. (Sept. 2014), archived at https://web.archive.org/web/20170421101141/https:/www.mckinsey.de/files/mck_connected_car_report.pdf.
[22] *Id. See also* Ex. 10, Markus Löffler, et al., *Shifting gears: Insurers adjust for connected-car ecosystems*, MCKINSEY & CO. (May 20, 2016), https://www.mckinsey.com/capabilities/mckinsey-digital/our-insights/shifting-gears-insurers-adjust-for-connected-car-ecosystems.
[23] *Id.*

insurance program, Snapshot, in 2008, which takes into account driving times and ability.[24] The data gathered through an onboard diagnostics device—a self-diagnostic and reporting capable device—allows the insurance company to perform further personal and regional risk assessments.[25] Another innovation being tested in the insurance industry regards telematics devices, which transmit vehicle and driver data through wide-area networks and are subsequently used to, *inter alia*, create driver risk profiles.[26] Indeed, as detailed by the New York Times on March 11, 2024 in an article about these practice by Defendants, insurance companies admit they have relied on driver data to raise the cost of car insurance or deny coverage altogether.[27] Further, at least some of the driver data that insurers use to price their products come from data brokers who received the data from GM and OnStar themselves.[28]

**D. Customers did not consent and would never consent to GM and OnStar tracking their driving data and sharing and/or selling it to third parties.**

24.     Defendants worked together to profit from customers', including Plaintiffs', driving telematics data without their express consent. GM collected

---

[24] Ex. 11, https://www.progressive.com/auto/discounts/snapshot/.

[25] *Supra* n.22.

[26] *Id.*

[27] Ex. 12, Kashmir Hill, "Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies," THE NEW YORK TIMES (Mar. 11, 2024), https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html.

[28] *Id.*

customers' driving telematics data by equipping customers' cars with OnStar capabilities and/or providing OnStar connected services through either the OnStar Guardian App or GM-branded apps, such as, for example, the myChevrolet App. GM and OnStar makes its "connected services"—and accompanying data collecting practices—nearly unavoidable for customers.

25.     GM and OnStar ensure that customers' cars are "connected"—that is, capable of data harvesting—in one of two ways. One, GM cars are installed with OnStar-capable hardware and software, making the transmission of customers' telematics driving data the default. Moreover, GM and OnStar advertise the safety and convenience features of the OnStar Guardian App and/or GM-branded apps, such as the myChevrolet App, but obfuscate the true nature of the connected services that flow from customers' use of the mobile apps.

26.     Ostensibly, GM and OnStar coordinate to make its default data harvesting part of the back drop in a manner that avoids raising customers' attention because such practices are, at best, unpopular amongst drivers[29] and, at worst, repugnant to them.[30] Drivers are often unaware that their driving data is being

---

[29] Ex. 13, Susan Meyer, *Gen Z doesn't want to share data with auto insurance companies, but Millenials do*, THE ZEBRA, (updated Mar. 12, 2024) (finding majority of Americans do not want to share their driving data with insurance companies), https://www.thezebra.com/ resources/driving/telematics-driver-survey/.

[30] *See* Hill, *supra* n.27 (reporting customer whose driving data was collected by GM and OnStar without his knowledge and shared with his insurance company stated,

harvested and shared and/or sold to third parties because GM and OnStar *designed* it that way.

**E. GM and OnStar fail to adequately disclose they collect and share and/or sell customers' driving data with third parties.**

27.     The GM and OnStar agreements fail to adequately disclose how the corporations collect and share and/or sell customers' driving data with third parties. GM and OnStar do not adequately disclose to customers, including Plaintiffs, that they, *one*, collect customer driving data and, *two*, share and/or sell that sensitive data to third parties who provide it to auto insurers.

28.     GM's User Terms for Application Services, which incorporates the OnStar user terms and privacy statement, state "[w]e may collect, use, and share information about you, including the location of your Device or Vehicle *as described in the Privacy Statement for Application Services* available at www.onstar.com/privacy." (emphasis added).[31]

29.     In turn, the OnStar User Terms explains that "GM collects, users, and shares information from and about Your and your vehicle. The GM Privacy Statement describes what GM does with that information. *You consent to the*

---

"It felt like a betrayal . . . They're taking information that I didn't realize was going to be shared and screwing with our insurance").

[31] Ex. 14, User Terms for Application Services, last updated Nov. 14, 2022, https://www.onstar.com/content/dam/onstar/na/us/en/index/legal/user-terms-for-applications-servies/02-pdfs/user-terms-for-application-services.pdf.

*collection, use, and sharing of information described in the Privacy Statement*, and any revisions to the Privacy Statement, which may be modified as described in this document." (emphasis added).[32]

30.    One layer deeper, OnStar includes a supplemental privacy statement for application services where it explains that OnStar collects and treats "information from you as described in the OnStar Privacy Statement."[33]

31.    The *only* reference to sharing data with third parties in the OnStar Privacy Statement that even remotely relates to Defendants' practice at issue here is the following:

> "[OnStar] may also share data with third parties . . . where you have elected to receive a service from them and/or authorized them to request data from GM (for example, financial organizations who offer financing for the purchase or lease of GM vehicles *or usage based insurance providers*).

(emphasis added).[34] But this single sentence in the OnStar Privacy Statement—which is buried in a "drop down" that a user must toggle to reveal from its default hidden status—provides no basis for the conduct at issue in the instant suit.

32.    By its own terms, the OnStar Privacy Statement only allows OnStar to

---

[32] Ex. 15, User Terms for Connected Vehicle Services, last updated May 1, 2018, https://www.onstar.com/legal/user-terms.

[33] Ex. 16, Privacy Statement for Application Services, last updated May 1, 2022, https://www.onstar.com/content/dam/onstar/na/us/en/index/legal/legal-privacy-statement-jan012011/02-pdfs/Privacy-Statement-for-Application-Services.pdf.html.

[34] Ex. 17, General Motors U.S. Connected Services Privacy Statement, last updated July 1, 2023, https://www.onstar.com/legal/privacy-statement.

share data with third parties (in this case LexisNexis Risk Solutions and auto insurance companies) where the driver has *elected* to receive a service from those specific third parties and/or *authorized* those specific third parties to request data from GM.

33.    Plaintiffs did not elect to receive *any* service from LexisNexis Risk Solutions, let alone a service in which LexisNexis compiles their every driving move and provides that report to their car insurance providers against Plaintiffs' interest. Bound by its own terms then, GM cannot, through OnStar or otherwise, share data with LexisNexis and car insurance providers from which Plaintiffs never elected to receive services.

34.    Neither did Plaintiffs authorize LexisNexis Risk Solutions nor their auto insurance providers to request their driving data from GM. Putting aside how GM would even *know* about the private agreements between Plaintiffs and third parties such that GM could fairly and accurately confirm whether Plaintiffs authorized those third parties to request their driving data from GM, Plaintiffs provided no such authorization.

35.    Indeed, even according to GM's own example regarding "usage based insurance providers," GM is only allowed to share drivers' telematics with usage based insurance provides where the drivers "elected" to receive such usage-based insurance from their insurers and/or "authorized" their insurers to request their

driving telematics *from* GM. Plaintiffs did not such thing. It's the opposite: Plaintiffs are forced to pay higher insurance costs because GM shared their sensitive, private driving telematics without their consent, effectively forcing Plaintiffs into usage-based insurance services that they never elected to receive. Even if Plaintiffs' insurance providers did request this data, GM breached its agreement because Plaintiffs never authorized their car insurance providers to make those data requests in the first place.

36.    GM and OnStar employ a byzantine, multi-platform, cross-referential series of agreements to obfuscate the fact that they collect and share and/or sell customer data in a manner that is both procedurally and substantively unfair to customers, deceptive, and misleading. Plaintiffs do not and would never consent to the data harvesting that GM and OnStar engaged in because such practices are not disclosed in the agreements. To the extent such practices are disclosed (they are not), the disclosures are woefully inadequate to inform customers of those practices and do not contemplate—let alone obtain—their consent. Further, *nowhere* do they authorize—the conduct GM engaged in here.

37.    On March 22, 2024, according to a New York Times article, GM announced that two days previously it had "stopped sharing details about how people drove its cars with two data brokers [LexisNexis Risk Solutions and Verisk] that

created risk profiles for the insurance industry."[35] A GM spokesperson said in an email statement to the New York Times: "Customer trust is ap priority for us, and we are actively evaluating our privacy processes and policies." This change in practices was itself an acknowledgment by Defendants that, although the practice was profitable, they did not have the requisite legal consent to carry it out.

### F. Plaintiffs' Allegations

### Plaintiff Larry Reed

38.     Plaintiff Larry Reed is a retired GM employee who has owned and leased many GM vehicles throughout his life. In or about October 2022, he leased a 2022 Chevrolet Silverado.

39.     He understood the OnStar product functioned to locate his car in case of an accident and to provide WiFi. Both functions were particularly important to him as he went on hunting trips in remote areas. He renewed his OnStar subscription at least one time, 3 or 6 months after first leasing the car.

40.     At no time was Plaintiff Reed aware that the OnStar product was tracking his driving telematics. If he had known the OnStar product was tracking his driving telematics, he would not have activated the product or paid for a subscription.

41.     In December 2023, Plaintiff Reed was notified by his auto insurer of a

---

[35] Ex. 18, Kashmir Hill, *General Motors Quits Sharing Driving Behavior with Data Brokers*, THE NEW YORK TIMES (Mar. 22, 2024), https://nytimes.com/2024/03/22/technology/gm-onstar-driver-data.html.

sharp increase in his insurance premium. Upon following up, he learned the reason for the premium increase was a LexisNexis report, which his auto insurer mailed to him.

42.     Plaintiff Reed's LexisNexis report lists over 260 telematics driving events in or about 2023, including start date, end date, start time, end time, acceleration events, hard brake events, high speed events, distance, and VIN. The terms "acceleration event," "hard brake event," and "high speed event" are not defined.

43.     Plaintiff Reed has never enrolled in a "usage-based" auto insurance program.

44.     Plaintiff Reed had the reasonable expectation and understanding that GM would not be collecting this type of information without his express consent or authorization.

45.     Plaintiff Reed had the reasonable expectation and understanding that GM and OnStar would not share this type of information without his express consent or authorization.

46.     In fact, Plaintiff Reed would not have bought or leased a GM car in the first place had he known about its invasive data harvesting practice described herein.

**Plaintiff Darrnell McCoy, Sr.**

47.     Plaintiff Darrnell McCoy, Sr. is a U.S. Army veteran, a medically

retired Military Police Officer, and owner of a 2020 GMC Arcadia, which he purchased in March 2020.

48.    GM enabled OnStar on Plaintiff McCoy's car when he purchased it, making it the default. As such, Plaintiff McCoy used the associated OnStar services for the duration of the three-month period it was initially enabled by GM.

49.    Plaintiff McCoy did not renew or pay for OnStar beyond the initial three-month period.

50.    He uses the myGMC App on his mobile phone, which allows him to connect to his GMC Arcadia to, amongst other things, remotely start his vehicle.

51.    He did not knowingly consent to being tracked by OnStar or the myGMC App, although he did observe that after downloading the myGMC App, he would receive notifications on the App when he accelerated or braked suddenly.

52.    At no time was Plaintiff McCoy aware that the OnStar product was tracking his driving telematics and sharing that data with third parties. If he had known the OnStar product was sharing his driving telematics, he would not have continued to use the product.

53.    In April 2023, Plaintiff McCoy was notified by his auto insurer of a sharp increase in his insurance premium. Due to the significant increase in cost to his car insurance, Plaintiff McCoy switched auto insurers.

54.    Plaintiff McCoy has never enrolled in a "usage-based" auto insurance

program.

55.   Plaintiff McCoy had the reasonable expectation and understanding that GM would not be collecting this type of information without his express consent or authorization.

56.   Plaintiff McCoy had the reasonable expectation and understanding that GM and OnStar would not share this type of information without his express consent or authorization.

## CLASS ACTION ALLEGATIONS

57.   Plaintiffs bring this class action individually on behalf of themselves and on behalf of all members of the following Classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Classes:

**Nationwide Class:** All persons residing in the United States who within the applicable statute of limitations had their vehicle's driving data collected and shared with a third party without their consent.

**California Class:** All persons residing in California who within the applicable statute of limitations had their vehicle's driving data collected and shared with a third party without their consent.

**Michigan Class:** All persons residing in Michigan who within the applicable statute of limitations had their vehicle's driving data collected and shared with a third party without their consent.

58.   Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendants have a

controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

59.    Plaintiffs reserve the right to modify or amend the foregoing Classes definitions before the Court determines whether certification is appropriate.

60.    <u>Numerosity:</u> The members in the Classes are so numerous that joinder of all Class Members in a single proceeding would be impracticable. As noted above, it has been reported that OnStar had 1 million GM subscribers in 2020.

61.    <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

      a.    Whether Defendants collected Plaintiffs' and Class Members' driving telematics data;

      b.    Whether Plaintiffs and Class Members knowingly consented to have the data shared with third parties;

      c.    Whether Defendants' practices are an invasion of privacy;

      d.    Whether Defendants' practices are unfair and/or deceptive;

      e.    Whether Defendant's conduct was knowing and willful;

      f.    Whether Defendants' contracts were uniformly misleading in a way; and

g.      Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages, and the measure of such damages.

62.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

63.     Typicality: Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like all proposed Class Members, had their driving telematics data collected and shared with third parties without consent. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

64.     Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Classes and have no interests adverse to, or conflict with, the class(es) they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex customer protection class actions of this nature.

65.     Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are

likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### INVASION OF PRIVACY
**(On Behalf of Plaintiffs and the Nationwide Class)**

66.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 65 above, as if fully set forth herein.

67.    Plaintiffs and Class Members have a common law, legally protected privacy interest in their driving telematics data and are entitled to the protection of their information and property against unauthorized access.

68.    Plaintiffs and Class Members reasonably expected their driving

telematics data would not be collected by GM and shared with third parties without their express consent.

69.     GM unlawfully invaded the privacy rights of Plaintiffs and Class Members by: (a) collecting their driving telematics data in a manner that is highly offensive to a reasonable person; and (b) disclosing their driving telematics data to unauthorized parties without the informed and clear consent of Plaintiffs and Class Members.

70.     In intentionally sharing Plaintiffs and Class Members' Personal Information, GM acted in reckless disregard of their privacy rights, intruded into their seclusion, and publicly disclosed their private data.

71.     As a direct and proximate result of GM's unlawful invasions of privacy, Plaintiffs and Class Members' private, personal, and confidential information has been accessed or is at imminent risk of being accessed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiffs and Class Members have suffered injuries as a result of GM's unlawful invasions of privacy and are entitled to appropriate relief.

72.     Plaintiffs and Class Members are entitled to actual damages, punitive damages, and compensatory damages for invasion of their privacy in an amount to be determined by a jury at trial.

<u>**COUNT II**</u>
**CALIFORNIA CONSTITUTIONAL INVASION OF PRIVACY**
**(On Behalf of Plaintiff McCoy, Sr., and the California Class)**

73.    Plaintiff McCoy, Sr. (for the purposes of this count, "Plaintiff") realleges and incorporates by reference the allegations contained in paragraphs 1 through 65 above, as if fully set forth herein.

74.    Plaintiff brings this claim on behalf of himself and the California Class.

75.    Article I, section I of the California Constitution states:

All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*.

Cal. Const. art I § 1 (emphasis added).

76.    Plaintiff and California Class Members have an interest in precluding the dissemination and misuse of their driving telematics data by Defendants, and using their personal property without observation, intrusion, or interference by Defendants.

77.    Plaintiff and California Class Members had no knowledge and did not consent or authorize Defendants to obtain their driving telematics data or to share it with third parties, let alone the specific data brokers Defendants shared it with and/or sold it to.

78.    Plaintiff and California Class Members enjoyed objectively reasonable expectations of privacy surrounding their driving telematics data.

79.     Defendants' intrusion upon seclusion occurred the moment Defendants began tracking Plaintiffs and Class Members' driving telematics data.

80.     Defendants' conduct was intentional and intruded on Plaintiff's and California Class Members' use of their personal property.

81.     Defendants' conduct was highly offensive to a reasonable person because they shared and/or sold the data for reports for auto insurance companies to influence Plaintiff's and California Class Members' insurance rates without their prior knowledge or consent.

82.     As a direct and proximate result of Defendants' invasions of privacy, Plaintiff and California Class Members have suffered and will continue to suffer injury and damages, as alleged herein, including but not limited to overpayment for auto insurance services and decreased value of their driving telematics data.

83.     Plaintiff and Class Members week all relief available for invasion of privacy claims under the California Constitution, including nominal damages and general privacy damages.

**COUNT III**
**CALIFORNIA UNFAIR COMPETITION ACT**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On Behalf of Plaintiff McCoy, Sr. and the California Class)**

84.     Plaintiff McCoy, Sr. (for the purposes of this count, "Plaintiff") realleges and incorporates by reference the allegations contained in paragraphs 1 through 65 above, as if fully set forth herein.

85.     Plaintiff brings this claim on behalf of himself and the California Class.

86.     Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

87.     Defendants violated Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

88.     Defendants has engaged in "unlawful" business practices by violating California common law and California constitutional right to privacy.

89.     Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the true function and purposes of Defendants' data collection.

90.     As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiff and California Class Members were injured and suffered damages, as alleged herein, including but not limited to invasion of privacy; overpayment for auto insurance services; and decreased value of their driving telematics data.

91.     Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and California Class Members' rights.

92.     Plaintiff and California Class Members seek all monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair,

unlawful, and fraudulent business practices and reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

<u>COUNT IV</u><br>
<b>MICHGAN CONSUMER PROTECTION ACT</b><br>
<b>Mich. Comp. Laws Ann. §§ 445.903 <i>et seq.</i></b><br>
<b>(On Behalf of Plaintiff Reed and the Michigan Class)</b>

93.     Plaintiff Reed (for the purposes of this count, "Plaintiff") realleges and incorporates by reference the allegations contained in paragraphs 1 through 65 above, as if fully set forth herein.

94.     Plaintiff brings this claim on behalf of himself and the Michigan Class.

95.     Plaintiff and Michigan Class Members are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

96.     Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

97.     As described herein, Defendants engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, which violate Mich. Comp. Laws Ann. § 445.903(1) in the following ways:

a.      Representing that is goods and services have characteristics, uses, and benefits they do not have;

b.      Representing that its goods and services are of a particular standard or quality if they are of another;

27

c.     Failing to reveal a material fact, the omission of which tends to mislead or deceive the customer, and which fact could not reasonably be known by the customer;

d.     Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

e.     Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

98.    Defendants' representations and omissions were material because they were likely to deceive reasonable customers about the data collection and sharing practices alleged herein.

99.    Defendants intended to mislead Plaintiffs and Michigan Class Members and induce them to rely on its misrepresentations and omissions.

100.   Plaintiffs and Michigan Class Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

101.   As a direct and proximate result of Defendants' unconscionable, unfair, and deceptive acts and practices, Plaintiffs and Michigan Class Members have suffered and will continue to suffer injury and damages, as alleged herein, including but not limited to invasion of privacy; overpayment for auto insurance services; and

decreased value of their driving telematics data.

102.   Plaintiffs and Michigan Class Members seek all monetary relief allowed by law, including the greater of actual damages or $250, and any other relief that is just and proper.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all other Class Members, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A.  Certifying the Classes as requested herein, designating Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.  Awarding Plaintiffs and the Classes appropriate monetary relief, including actual damages, statutory damages, and punitive damages;

C.  Awarding Plaintiffs and the Classes pre-judgment and post-judgment interest to the maximum extent allowable;

D.  Awarding Plaintiffs and the Classes reasonable attorneys' fees, costs, and expenses, as allowable; and

E.  Awarding Plaintiffs and the Classes such other favorable relief as allowable under law.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Date: March 28, 2024                           Respectfully submitted,

                                               */s/ E. Powell Miller*
                                               E. Powell Miller (P39487)
                                               Emily E. Hughes (P68724)
                                               Dennis A. Lienhardt (P81118)
                                               **THE MILLER LAW FIRM, P.C.**
                                               950 W. University Drive, Suite 300
                                               Rochester, MI 48307
                                               Tel: (248) 841-2200
                                               epm@millerlawpc.com
                                               eeh@millerlawpc.com
                                               dal@millerlawpc.com

                                               Hassan Zavareei
                                               Sabita J. Soneji
                                               Cort Carlson
                                               **TYCKO & ZAVAREEI LLP**
                                               1970 Broadway, Suite 1070
                                               Oakland, CA 94612
                                               Tel: (510) 254-6808
                                               Hzavareei@tzlegal.com
                                               ssoneji@tzlegal.com
                                               ccarlson@tzlegal.com

                                               Jeff Ostrow
                                               Steven Sukert
                                               **KOPELOWITZ OSTROW P.A.**
                                               One West Law Olas Blvd., Suite 500
                                               Fort Lauderdale, Florida 33301
                                               Tel: (954) 332-4200
                                               ostrow@kolawyers.com
                                               sukert@kolawyers.com

                                               Gary Klinger
                                               **MILBERG COLEMAN BRYSON
                                               PHILLIPS GROSSMAN, PLLC**
                                               227 W. Monroe Street, Suite 2100
                                               Chicago, IL 60606
                                               Tel: (866) 252-0878

30

gklinger@milberg.com

Frank Hedin
**HEDIN LLP**
1395 Brickell Ave., Suite 1140
Miami, FL 33131
Tel: (305) 357-2107
fhedin@hedinllp.com

*Counsel for Plaintiffs and the Putative
Classes*